Mr. Fahmy. Thank you, Your Honor. May it please the court, I apologize, I'm getting over a bit of a cold, so if I'm not clear, please let me know and I'll try to speak up. Your Honors, the board had no rational basis for concluding that the person of ordinary skill would have found it obvious to use the pump open plug described by Halliburton at the end of the tubing string disclosed in Thompson. The board indicated that Thompson expressed a general desire to use a tailpipe plug other than the ones reported in the paper, the pump out plug, the cycle plug, and the person of ordinary skill would consider Halliburton's pump open plug to be a good option. But that ignores Thompson's expressed recommendations in its paper that the tailpipe plug should actually be a disappearing plug to guard against the very kinds of failures that Thompson had experienced. They were due to share pin based failures that existed in the, also existed in the Halliburton pump open plug. The board's decision doesn't explain why the person of ordinary skill would adopt just an option that was not recommended. And it was for a tailpipe plug that included the exact same kind of failure mechanism, the share pins, that Thompson said raised concerns of reliability. And absent that, why the board's conclusion of obviousness can't be regarded as a rational one. Your Honor, as was pointed out at the board, the Halliburton pump open plug was intended for production, not fracturing, and the parties agree that the two are different. Furthermore, the Halliburton plug contained the same, as I say, failure mechanism, the share pins, and therefore posed the same risk that Thompson had identified and said raised concerns of reliability. And the tailpipe plug that we're talking about is not just some, you know, afterthought. It's what Thompson called one of the most crucial elements of the tire completion system. Now, Halliburton, in the catalog, advertised the exact kind of disappearing plug. One question, what is the difference between these different types of plugs? I think from the record I have an understanding, but if you could explain what you're talking about with respect to these different openings at the bottom of the screen. It's 2569, and my understanding is that, as is indicated in this page from the Halliburton catalog, this is a plug that holds pressure but can be pumped open, that is, would allow fluid to escape by basically applying an overpressure from the surface. And I think the way it does that is, you see in the diagram, there's something called a release pin. If there's an overpressure above that release pin. Yeah, that part I understand how it slips down and the opening appears, but the pump open plug, is that the bottom part? It's at the very end. It's the furthest thing down the well, as I understand it. And one of the differences on the next page, 2573, is the disappearing plug. And in this case, you see there's no pin, there's a salt plug. And as I understand it, that dissolves over time in order to allow the fluid to go through. So that would be one of the differences. And I think that's probably the important difference. Your Honor, as I say, we see from the record that Halliburton advertised the exact disappearing plug that Thompson recommended using. That plug can be used to not only set production packers, but according to Halliburton, also isolation packers, as we found in the fracturing arrangement. It was able to offer multiple pressure cycle capability, as is needed. And it reduced well risk. So in other words, it was the very type of plug that was promoted for meeting all the requirements that Thompson had. And it would have been the rational choice for the person of ordinary skill. The person of ordinary skill would have applied common sense and adopted the plug that Thompson was recommending. To adopt the plug, the pump open plug, as the board found, simply wouldn't comply with that common sense. It posed the same risks and it wasn't the one being recommended. And so because the board erred in the conclusion of obviousness, you should reverse on that basis. We also raised issues about the commercial success evidence that was produced by rapid completions. And Your Honor, that evidence… What about getting into the commercial success issue? Don't we have a problem with the decision in the prior case in this court? Grant, it was without an opinion, I believe. But still, don't you run into a res judicata collateral estoppel type of situation? My… On your second two issues about this and your claim with respect to the rebuttal evidence. Thank you, Your Honor. My colleagues have raised the issue of collateral estoppel, but I think it doesn't apply. In the prior case dealing with the 774 patent, the board, when it came to commercial success, said the evidence wasn't strong. Well, in order to reach that basis, they must have found that there was some evidence of commercial success and they would have considered it. But here, they completely disregarded the evidence of commercial success. So we're really dealing with a different issue. It's not a question of whether commercial success would have necessarily carried the day by itself. The board simply disregarded the evidence and said that it did not show evidence of commercial success. And with regard to the idea of the failure of the board to permit the patent owner to submit an expert declaration along with the… With respect to the Kim and Abbas evidence. In the 774 case, the issue that was raised was whether the board had shifted theories of obviousness. We're presenting a slightly different issue, not so much that the theory of obviousness was shifted, but that the board denied the opportunity for the patent owner, or the licensee in this case, to present fact-based evidence. They permitted argument, but no fact-based evidence in terms of the testimony. And the APA, Section 554B of 5 U.S.C., requires that both fact and evidence be permitted in order to provide meaningful rebuttal. The whole purpose of the SIR reply is to provide meaningful rebuttal for the patent owner so that they can, in fact, deal with any extra petition evidence. You did have the right to, you were given the right to submit a SIR reply. Five pages, Your Honor, yes. And our cases do seem to support the proposition that that is adequate in the face of, in the kind of situation that you faced. Well, I actually disagree with you on that point, Your Honor. I think Jensheim says that the patent owner has to be given an opportunity to respond. But a response that is just argument in the face of new expert testimony commenting on a new reference, that's really no response at all. And, in fact, the Board criticized the patent owner in its written decision, saying, we don't accept your argument. Well, you didn't give us the opportunity to submit anything other than argument. That can't be right. Your Honors, I'll reserve the remaining time, unless you have other questions. Thank you. Mr. Wilson. Thank you, Your Honors. May it please the Court. Rapid Completions raises three issues, only one of which, as Judge Schall recognized, is newly before this Court. That's the motivation to combine the Halliburton pump-open plug. The Board relied on a series of evidence to support the idea that the Halliburton pump-open plug could be combined with both Thompson and Yost, the multistage fracturing systems. First, the Board relied on the fact that Thompson disclosed there are only two things this thing needs to do, this plug needs to do. It needs to hold pressure until it needs to open, and then it needs to open and expose a pathway for fracturing at the toe of the well, at the bottom of the well. The Board said, Halliburton discloses the pump-open plug does precisely that. And so a person of ordinary skill in the art would be motivated to do it, to make that substitution. Now, Rapid Completions says there's a couple of problems with that. First, Thompson discourages the use of shear pins. That's not true, Thompson doesn't. Thompson, what Thompson does is it says, hey, this is an area where we had some issues, even though we completed four wells successfully, stimulating and producing them. This is an area where there might be room for improvement in the future if we have to choose an area. A disappearing plug may be cost effective and reliable, but that's for the future. So what Thompson said is consider what's cost effective and reliable, and the Board said the Halliburton pump-open plug meets that. Substantial evidence supports the Board's finding. In addition to that evidence, the Board also relied on Overby in Dr. Rao's testimony regarding the Overby reference, which says when you're doing open-hole multistage fracturing, use a pump-open plug at the toe of the well in this precise application. They didn't say anything about that. They don't say anything about that. All they say is that the Board didn't actually rely on that, but that's false. The Board did at Appendix 50 and Appendix 175. You can read it in the Board's opinions where it cites Dr. Rao's declarations. In paragraphs 44 and 69 in the 1232 declaration and paragraphs 44 to 45 and 70 in the 1236 declaration, you will see Dr. Rao opining specifically on what Overby teaches about using a pump-open plug at the toe of an open-hole multistage fracturing system. There's no response to that. That is substantial evidence supporting the Board's conclusion. On the commercial success point, the Board's findings really aren't heavily disputed here. I didn't hear any argument that they made a showing before the Board that the claimed methods were used in any amount of sales. That's the failure that the Board identified in their commercial success showing, and there has been no presentation before this Court of any evidence of sales tied to the specific claimed method limitations. Why is that important? It's important because the stack frac system, the set of tools, are disclosed in the Thompson Prior Art Reference. The only thing they can try and hinge patentability on is the use of those tools in a new environment, particularly an open-hole horizontal well. Thompson used the same tools in a case-told well. So if they're going to show commercial success, they have to show commercial success in a specific well environment. They have made no showing of that. So the Board's finding that they failed to show commercial success is supported by substantial evidence. On top of that, with respect to the collateral estoppel issue that Judge Schall raised, the issues are precisely the same. In the Board's opinion in the 774 IPR, which was previously appealed, the Board said, we find that you have failed to show commercial success and we give it no weight. It made the precise same finding here. Does it make any difference that the language, that the claims of the 774 are a bit different from the claims of the 501? The 501 added some limitations. So it did, Your Honor. The limitations that it added are specifically with respect to the hydraulically actuated sliding sleeve. All that does is make it harder for rapid completions to show commercial success here. But the specific disputes with respect to their showing of commercial success were the same in both cases. In other words, they didn't show that the specific wells in which these tools were used were horizontal open-hole wells. When their own ads say they can be used in case-told vertical wells. So I don't think that difference in claim language makes any difference, Your Honor. Finally, with respect to the APA violation, as counsel noted, the only thing the APA requires is notice and an opportunity to respond. They were given that. They were given a six-page certify, in fact. On top of the fact that they were given a six-page certify, they actually have not shown any harm from that violation. All of that evidence was submitted in the context of an argument on unexpected results. They have not appealed the board's finding of unexpected results. That they have failed to show unexpected results. So in the absence of appealing that specific finding, whether they get to submit more evidence can't possibly matter. And in fact, they haven't offered any indication of what type of expert testimony they would submit that would have changed that result. So I submit that there is no harm. No APA violation, and even if there were, there is no harm. And if there are no further questions, I'll cede the rest of my time. Thank you. Thank you, Your Honor. Mr. Fahmy. Thank you, Your Honor. Let me address the points that counsel has raised. With respect to the obviousness question, the court should be concerned with what a person of ordinary skill would have done, not what they could have done. And that's why merely being an option is not good enough in terms of the Halliburton pump-open plug. My colleague referred to the board's reliance on overbeating. Well, in fact, they never cite overbeating. The board's discussion of this begins on Appendix 49 and says that it's basing its decision on the fact that Thompson's indication of a desire to use a tailpipe plug different from a pump-open or cycle plug provides the motivation to use a different plug, that Halliburton's pump-open plug would be the good option. On page 50, where it cites the declaration, that was in connection with an expectation of success, and it's the declaration testimony, not the evidence that's cited. We're just talking about the sliding sleeve? Yes, Your Honor, the sliding sleeve. Okay. And as we say, simply being an option is not the proper test. It has to be what the person of ordinary skill would have done. Regarding the evidence of commercial success, the patent owner did submit reliable evidence, in fact. That was in the form of the declaration by the patent owner's CFO, and that declaration tied the vast majority of the company's revenue and profits to not just sales of the tools, but actually performance of the method. And the board agreed that the evidence that the patent owner had submitted showed that there were instances where these tools were used in the claim method. And that should have given rise to the presumption of commercial success in favor of the patent owner. But that presumption was never granted, and as a result, the petitioner was never required to even rebut the evidence, as they should have been. And finally, there was harm in not allowing the patent owner to submit the expert testimony. The board, in this case, specifically relied on the Kim and Abass paper in its final written decision. In fact, they credited the testimony of Weatherford's expert because of the Kim and Abass paper, testimony that the patent owner was not allowed to rebut with its own expert. Where have we established a presumption of commercial success? The presumption of commercial success, Your Honor, I think comes out of PPC broadband, this court's opinion in PPC broadband cited in our papers. If there are no further questions, Your Honor, we urge you to reverse the board's decision on obviousness, or at a minimum, send this case back so that the commercial success evidence can be properly considered. Thank you. Thank you. Thank you both. The case is taken under submission.